**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

SHANNI SNYDER,                          ) JURY TRIAL DEMANDED
                                        )
                    Plaintiff,          )
                                        )
            vs.                         ) Civil No. **1 2 - 0 9 1 2**
                                        )
RMWS LIMITED, a Pennsylvania            )
corporation, SCALISE CONSTRUCTION,      )          **RECEIVED**
INC., a Pennsylvania corporation,       )
WILLIAM SCALISE,                        )          JUL  2 2012
DOMINIC SCALISE, and                    )
ROBERT C. MALT,                         )       CLERK, U. S. DISTRICT COURT
                                        )       WEST. DIST. OF PENNSYLVANIA
                    Defendants.         )

<u>COMPLAINT</u>

AND NOW COMES the Plaintiff, Shanni Snyder, and files this, her Complaint:

1. Shanni Snyder ("Snyder") is an individual residing at 1140 Augusta Circle in Irwin, Pennsylvania.  However, due to the actions of the defendants and others, Snyder cannot presently access her property.  Snyder's mailing address is Post Office Box 96, East McKeesport, PA 15035.

2. The first defendant is RMWS Limited, a Pennsylvania corporation.  According to the Pennsylvania Secretary of State, RMWS maintains an address at 8340 Pennsylvania Avenue in North Huntingdon, Pennsylvania.

3. The second defendant is Scalise Construction, Inc., a Pennsylvania corporation.

4. The third defendant is William Scalise.  Based on information, William

Scalise does business at 8340 Pennsylvania Avenue, North Huntingdon, PA 15642.

5. The fourth defendant is Dominic W. Scalise. Based on information, Dominic Scalise does business at 8340 Pennsylvania Avenue, North Huntingdon, PA 15642.

6. The fifth defendant is Robert C. Malt.

## Jurisdiction

7. This Court maintains jurisdiction over Count I of this action pursuant to 28 USC 1331 and 42 Pa.C.S. 3613 as it is based on violation of the Fair Housing Act, 18 USC 1964(c) as it is based on the Racketeer Influenced Corrupt Organizations Act. This Court maintains jurisdiction over the civil rights claims pursuant to 28 USC 1343(a) and 42 USC 1983. This Court maintains jurisdiction over the state law claims pursuant to 28 USC 1367.

## COUNT I – Fair Housing Law (42 USC 3604(a))

8. Paragraphs 1 through 7 are hereby incorporated by reference as if fully set forth again.

9. This is an action filed by an aggrieved person after the occurrence of a discriminatory housing practice or breach. 42 USC 3613(a)(1)(A).

10. Defendants are in the business of selling or renting dwellings and they have, within the preceding twelve months, participated as principal or agent, in three or more transactions involving the sale or rental of any dwelling or interest therein. 42 USC 3603(c).

11. Even if the defendants cannot be said to be defined by 42 USC 3603(c),

they remain governed by the Fair Housing Law because none of the exemptions in 42 USC 3603(b) apply to them.

12. Between June 26, 2011, and July 2, 2011, in violation of 42 USC 3604(a), the defendants refused to rent 1140 Augusta Circle, Irwin, PA 15642 to the Plaintiff after she made a *bona fide* offer based on the sex and familial status of the Plaintiff. Specifically, as a result of the Plaintiff acquiring a protection from abuse Order against a relative living in the house, the Defendants made it clear that, due to the sex and familial status of the Plaintiff (single female with children, without her relative living with her, and being under a protection from abuse order), they did not want her to occupy the dwelling. Therefore, they evicted her without lawful process.

13. Between June 26, 2011, and July 2, 2011, in violation of 42 USC 3604(a), the defendants refused to negotiation for the sale of 1140 Augusta Circle to the Plaintiff based on her sex and familial status (single female with children, without her relative living with her, and being under a protection from abuse order).

14. Between June 26, 2011, and July 2, 2011, in violation of 42 USC 3604(a), the defendants refused to negotiation for the rent of 1140 Augusta Circle to the Plaintiff based on her sex and familial status (single female with children, without her relative living with her, and being under a protection from abuse order).

15. Defendants, through their agent William Scalise, made it clear to Plaintiff that this was the reason for the actions.

16.   As a proximate result of the defendants' violation of 42 USC 3604(a), the Plaintiff was damaged in that she was forced to immediately vacate her residence, was unable to obtain a lease extension, and was not given an opportunity to purchase the house.

WHEREFORE, Plaintiff demands judgment against the Defendants in an amount to be proven consisting of actual and punitive damages and log with an order directing affirmative action as this Court deems appropriate pursuant to 42 USC 3613(c)(1).  Additionally, Plaintiff demands reasonable attorney fees, if any, and costs pursuant to 42 USC 3613(c)(2).

### COUNT II – Fair Housing Law (42 USC 3604(b))

17.   Paragraphs 1 through 16 are hereby incorporated by reference and are realleged as if fully set forth again.

18.   This is an action filed by an aggrieved person after the occurrence of a discriminatory housing practice or breach.  42 USC 3613(a)(1)(A).

19.   Defendants are in the business of selling or renting dwellings and they have, within the preceding twelve months, participated as principal or agent, in three or more transactions involving the sale or rental of any dwelling or interest therein.  42 USC 3603(c).

20.   Even if the defendants cannot be said to be defined by 42 USC 3603(c), they remain governed by the Fair Housing Law because none of the exemptions in 42 USC 3603(b) apply to them.

21.   Between June 26, 2011, and July 2, 2011, in violation of 42 USC 3604(b), the defendants discriminated against the Plaintiff in the terms, conditions, and privileges of the rental and possession of 1140 Augusta

Circle, North Huntingdon, PA 15642 or the facilities in connection

therewith, because of the Plaintiff's sex and familial status (single female

with children, without her relative living with her, and being under a

protection from abuse order).

22.     Defendants, through their agent William Scalise, made it clear to

Plaintiff that this was the reason for the actions.

23.     As a proximate result of the defendants' violation of 42 USC 3604(b), the

Plaintiff was damaged in that she was forced to immediately vacate her

residence, was unable to secure a lease renewal or extension, and was

otherwise denied the opportunity to possess the residence in exchange

for the same compensation that the defendants accepted from others.

WHEREFORE, Plaintiff demands judgment against the Defendants in an

amount to be proven consisting of actual and punitive damages and log with an

order directing affirmative action as this Court deems appropriate pursuant to 42

USC 3613(c)(1).  Additionally, Plaintiff demands reasonable attorney fees, if any, and

costs pursuant to 42 USC 3613(c)(2).


**COUNT III (Rackateer Influenced Corrupt Organizations Act, 18 USC 1961)**

24.     Paragraphs 1 through 23 are hereby incorporated by reference and are

realleged as if fully set forth again.

25.     Defendants William Scalise, Dominic Scalise, Robert C. Malt, among

others, created and operate enterprises extensively engaged in fraud,

corruption of public officials, providing political favors and donations in

exchange for favorable treatment, bribery, tax evasion, obstructing

justice, creating fraudulent and forged documents, and other criminal and discriminatory conduct known as RMWS Limited, which is a Pennsylvania shell corporation, and Scalise Construction Inc., also a Pennsylvania corporation.  RMWS and Scalise Construction are operated jointly, with one providing services for the other, with commingling of activities. Therefore, they are collectively referred to as RMWS or RMWS Limited in this Count.  RMWS Limited also aids and abets its influential clients in committing violations of federal law in an effort to assist them in obtaining the money to purchase the enterprise's property.

26.   The RMWS enterprise engaged in a pattern of racketeering activity from at least 2002 and going through 2012 through the activities outlined below, among others.

27.   In violation of 18 USC 201(b)(1), the defendants, directly and indirectly, corruptly gives, offers, and promised items of value to a public official, Douglas Weimer, a Magisterial District Judge in North Huntingdon, Pennsylvania, by providing political favors and support in exchange for the influence over official acts such as favorable decisions of cases in front of him.  The acts of bribery occurred on several occasions, including placing the name of William Scalise on political endorsements and making donations, informal and formal, to his political campaign, while having the district judge deny he even knew the defendants during court proceedings. The acts of bribery, occurring as recently as 2009, and possibly in 2010 and 2011, and on several occasions before that,

constitutes "racketeering activity" within the meaning of 18 USC 1961(D).

28.   In violation of 18 USC 201(b)(3), the defendants, directly or indirectly, corruptly gave, offered, or promised money and other items of value (including future work), to Gehrig Wilson and other agents of Wilson Painting to create false exhibits, including a proposal for $675.00 for services that were not actually done and were never planned to be done, with the intent to influence the testimony under oath of Wilson and other agents of Wilson Painting, at hearings and trials before the Court of Common Pleas of Westmoreland County during 2012.  The acts of bribery, occurring during 2012 constitute "racketeering activity" within the meaning of 18 USC 1961(D).

29.   In violation of 18 USC 201(b)(3), the defendants, directly or indirectly, corruptly gave, offered, or promised money and other items of value (including future work), to Roger Legas and other agents of Roger's Construction to create false exhibits, including a bill for $1,626.00 for services that were not actually done, with a label fraudulently stating that Roger's Construction is registered with the Attorney General as a Home Improvement Contractor when said registration expired in July 2011, over 9 months before the exhibit was made, and to provide testimony about the same, with the intent to influence the testimony under oath of Legas and other agents of Roger's Construction, at hearings and trials before the Court of Common Pleas of Westmoreland County during 2012.  The acts of bribery, occurring during 2012

constitute "racketeering activity" within the meaning of 18 USC 1961(D).

30.  In violation of 18 USC 1951, the defendants in late June 2011 or early July 2012, obstructed and affected commerce and the movement of various items in commerce, and threatened physical violence to the property, in furtherance of a plan or purpose to rob or obtain the property by extortion. The property consisted of various monetary instruments, furniture and other items belonging to the Plaintiff that were impounded and retained by the defendants. The robbery consisted of the defendants' unlawful taking of the property through threatened force and fear of injury, immediate or in the future. The property was obtained and taken by the defendants through extortion in that the defendants obtained the property through the threat of force, including through fear and under the color of an official right. The activities, described above, have an affect on interstate commerce within the meaning of 18 USC 1962(c).

31.  In violation of 18 USC 1957, in 2011, the defendants received funds from Tammy McCarl and Sharon Snyder knowing full well that the money was derived from specified unlawful activity including mail fraud in violation of 18 USC 1341 and federal tax evasion. The activities, described above, have an affect on interstate commerce within the meaning of 18 USC 1962(c).

32.  William Scalise, Dominic Scalise, and Robert C. Malt along with other agents and members of the RMWS enterprise each committed and/or aided and abetted the commission of more than two of each of the acts

of "racketeering activity" detailed herein and such acts are continuing and threaten to continue indefinitely.  These predicate acts are chargeable and indictable.  18 USC 1961(1).

33.  The predicate acts perpetrated are common to the scheme used by William Scalise, Dominic Scalise, Robert C. Malt, and other defendants to conduct the affairs of the RICO enterprise known as RMWS and were not isolated or sporadic.  These acts are, and were, related to one another and they pose a continuing threat of racketeering activity.

34.  The acts of racketeering activity were and are related to each other by virtue of the common participants, common victims, a common method of commission, and the common purpose of using deceptive, fraudulent, extortionate, bribery, influence peddling, and other means and ways to obtain properties, gain real estate rental and sales income, and other activities to obtain money and property.

35.  In violation of 18 USC 1962, the defendants received income derived, directly and indirectly, from the aforementioned pattern of racketeering activity.

36.  In violation of 18 USC 1962, the defendants attempted to, and may, received income, directly and indirectly, through the collection of an unlawful debt in which the defendants acted as a principal within the meaning of section 2, title 18, United States code.

37.  In violation of 18 USC 1962, the defendants , through a pattern of racketeering activity, and through the collection of an unlawful debt, acquired or maintained, directly or indirectly, an interest in or control

over the enterprise which is engaged in the aforementioned activities and which affects interstate commerce.

38.    In violation of 18 USC 1962, the defendants are associated with the enterprise engage in, and the activities which affect, interstate and foreign commerce.  The defendants also conduct and participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

39.    In violation of 18 USC 1962, the defendants conspired to violate the provisions of 18 USC 1962(a), (b) and/or (c) as described above.

40.    Plaintiff was damaged because the defendants violated 18 USC 1961, *et seq.*, through the racketeering activities described above.

41.    Plaintiff was damaged as a result of the defendants' violations of 18 USC 1961 in that she lost money and property, was the subject of extortion, incurred expenses investigating and reviewing fraudulent documents, was unlawfully removed from her residence, had to defend frivolous criminal charges that were terminated in her favor, and continues to incur fees, expenses, and damages.

WHEREFORE, Plaintiff respectfully demands that this Court:  (1) Award actual damages to be proven at trial, (2) Award treble damages, (3) Award compensatory damages, (4) Award punitive damages, (5) Enjoin each of the defendants from engaging in further acts similar to those described herein, (6) award costs, and (7) grant any and all further relief as may be appropriate and just.

**``COUNT IV – 42 USC 1983 (VIOLATIONS OF THE FOURTH AMENDMENT TO THEUNITED STATES CONSTITUTION AS MADE APPLICABLE TO STATES PURSUANT TO THE FOURTEENTH AMENDMENT)**

42.     Paragraphs 1 through 41 are incorporated by reference and realleged as if fully set forth again.

43.     At all times material, Scalise worked jointly with the North Huntingdon Police to deprive Plaintiff of her Constitutional rights.

44.     Several years ago, a house belonging to Shanni Snyder and her family members at 98 Arlene Drive in North Versailles, Pennsylvania, caught fire.  Shanni's parents, George Sr. and Sharon Snyder occupied the house.  Shanni sometimes occupied the house, but she also rented another house in North Huntingdon, Pennsylvania.

45.     The insurance company, Liberty Mutual, arranged for the leasing of a house at 1140 Augusta Circle, North Huntingdon, Pennsylvania, for Sharon to live in.  George Sr. chose to remain at 98 Arlene Drive.

46.     In early 2010, Shanni Snyder's landlord had disagreements including problems where the landlord would enter the house without permission and problems with mold and maintenance.  The landlord sued in February 2010 and obtained a judgment for possession in March 2010. Snyder promptly appealed to the Court of Common Pleas.  *Rudeen v. Snyder*, 1814 of 2010 (CCP Westmoreland).  The landlord of the 2629 Coulterville filed an eviction Complaint against Plaintiffs.  *Id.*

47.     During the time Plaintiffs and the landlord litigated the case, Shanni continued to assert in court papers that problems were present at the 2629 Coulterville address including insect infestation, a leaking roof,

and mold.  *Id.*

48.  The 1140 Augusta house, on the other hand, was very large.  Therefore, while living at the 2629 Coulterville address, Plaintiffs started staying at 1140 Augusta several nights a week.

49.  During the course of litigation, Plaintiffs and Shanni's other child continued to occupy both places, sleeping mostly at 1140 Augusta, but having personal property and items at 2629 Coulterville Road.

50.  At no time material to these events did Tammy McCarl (nee Snyder) reside at 1140 Augusta.  On the contrary, McCarl lived in Monroeville and, after she married Kevin McCarl, she moved into the residences at Piatt Place in Pittsburgh, Pennsylvania.

51.  In 2010, the insurance company quit paying the rent on the 1140 Augusta Circle house because the shelter benefits ran out.

52.  At that time, it was agreed between Sharon and Plaintiffs that Plaintiffs and Shanni Snyder's other child would move completely into the house.

53.  Because Sharon has a judgment against her for $1,808,676 in favor of the United States, she did not want the lease to be in her name. *United States v. Sharon Snyder*, 2009 U.S. App. LEXIS 12394,*;327 Fed. Appx. 323 (3rd Cir. 2009).

54.  Specifically, Sharon did not want the Internal Revenue Service to think that she had $3,000.00 per month to pay in rent for a house.  Therefore, Sharon asked Tammy McCarl to place her name on the lease.[1]

55.  Despite not having any intention of living at the house, and solely to

---

[1] Indeed, Tammy McCarl has been assisting Sharon Snyder launder money for several years, completely paying for Sharon's entire luxurious lifestyle.  None of the gifts Tammy McCarl provides Sharon are declared to the IRS.

protect Sharon's assets from the Internal Revenue Service, McCarl

agreed to list her name as the lessee.  Defendants knew about this tax

scam.

56.    However, since McCarl never maintained any intention of occupying,

living at, or using the house, with the knowledge of the defendants, the

lease contained specific authorization for the occupants of the house to

be two adults and two children.   The lease did not require notification

to the landlord as to the identity of the occupants and it did not require

Tammy McCarl to live at the house.  Rather, the lease states at

paragraph 7 that:

**Occupancy shall be limited to 2 adults and 2 children.  Occupation
by more people shall be in direct violation of this agreement and
shall be the basis for immediate termination in the sole discretion
of the Landlord (Owner).**

57.    Tammy McCarl does not have children.   Sharon's children are all

adults.  The two adults were to be Sharon and Shanni.  The children

were Shanni's two children.   Defendants knew this.

58.    The lease did not contain a prohibition that prevented Tammy McCarl

from subletting the house and it did not specify any limitations on the

rights or status of the "2 adults and 2 children" occupants.[2]  The

defendants understood this and why it was 2 adults and 2 children.

59.    Because Shanni moved into the 1140 Augusta Circle house with her

children, she entered a settlement with the landlord of the 2629

Coulterville house.  The settlement was in the form of a Court Order

---

[2] The Landlord Tenant Act of 1951 makes it clear that the terms of the lease apply to tenants who have been sublet the property.

that agreed Shanni would leave the 2629 Coulterville house no later than October 21, 2010.  *Rudeen v. Snyder*, 1814 of 2010 (CCP Westmoreland).

60. By October 21, 2010, Plaintiffs and Shanni's other son stayed full time at the 1140 Augusta Circle house.  The defendants knew this.

61. The only resident of the 1140 Augusta house when Plaintiffs moved in was Sharon Snyder.  After the Plaintiffs moved in with Shanni's other son, the only residents were Shanni, Emanuel, Matthew, and Sharon Snyder.  The defendants knew this.

62. Tammy McCarl neither resided at nor occupied the house at this time. The defendants knew this.

63. At no time from the beginning of the lease to the events here, except as stated in this document, did McCarl stay the night at 1140 Augusta Circle.  The defendants knew this.

64. Because some of Shanni's property remained at the 2629 Coulterville house, she negotiated an extension to completely move out of that house by October 25, 2010.  *Id.*

65. Plaintiffs removed their belongings from the 2629 Coulterville house and moved them into the 1140 Augusta Circle house shortly before October 25, 2010.

66. From October 25, 2010 forward, Plaintiffs resided solely and exclusively at the 1140 Augusta Circle house along with Sharon and Shanni's other son. The defendants knew this.

67. On June 20, 2011, Sharon attacked Shanni and assaulted her.

68. Shortly thereafter, and in fear, Shanni left the house for a couple of days.

69. Shanni did not vacate her residence in any manner during this short time period. Shanni did not remove her personal property.

70. On June 27, 2011, Shanni obtained a protection from abuse order from the Westmoreland Court of Common Pleas. The Order stated that, "[Sharon] is specifically ordered to stay away from the following locations for the duration of order: 1140 Augusta Circle, Irwin, PA 15642." *Shanni Snyder v. Sharon Snyder*, No. 1280 of 2011 D (Westmoreland County Court of Common Pleas).

71. The Order also addressed how Sharon was to obtain her personal effects. The Order stated, "[Sharon] may go back to the residence, one (1) time only, along with a constable to retrieve her personal belongings only. The constable will contact [Shanni] to make these arrangements." *Id.*

72. The Order directed that a copy be provided to the North Huntingdon Police Department. *Id.*

73. On June 27, 2011, after the Court issued the PFA Order, but before it was served, Shanni learned that Sharon was arguing with Plaintiff Emanuel Snyder and becoming aggressive. Therefore, Shanni called the police. When the police arrived, the child advised Dippolito and Arendas that Sharon had became aggressive and began pointing her finger in his face.

74.    Wanting to verify that her children were safe, and desiring to enter her residence without fear of harm, Shanni arrived on the scene.

75.    Shanni noted the PFA and asked the police to remove Sharon so she could enter.

76.    Notwithstanding that the PFA Order clearly indicated it should be provided to the North Huntingdon Police, and despite the Order stating that Sharon cannot go near the house,  Dippolito and Arendas stated they would not serve the Order and that Shanni had to wait for the Sheriff to come.

77.    Notwithstanding the clear language of the PFA, Dippolito and Arendas further tried to state that the PFA did not require that Sharon leave the house.

78.    However, when the Sheriff's Deputies arrived on the scene, the Sheriff's Deputies directed Sharon to leave.  They provided Sharon an opportunity to gather her personal belongings.

79.    Tammy McCarl and her husband, Kevin, arrived as well.  The Sheriff's Deputies explained to Sharon and the McCarls that Sharon needed to leave and that she could return only with a Constable on one occasion after having the Constable make a prior appointment with Shanni.

80.    According to Dippolito's police report, "All matters of the PFA were explained to George and Sherry Snyder while in the presence of Tammi [sic] Snyder and her husband Kevin McCarl.  The PFA allows no contact between Sherry and George Snyder [Sr.] with Shanni Snyder nor any contact with [Shanni's children]".

81.     Dippolito also noted in his report that after the explanation, the McCarls and Sharon left and that "Shanni and her sons remained."

82.     Based on information, Arendas contacted William Scalise, the landlord, and advised him of the PFA against Sharon. Scalise told Arendas that the lease was in the name of Tammy (Snyder) McCarl, but that she rented it for Sharon. Dippolito's report indicates that Tammy McCarl "leased [the house] for [Sharon] to stay as their previous home was destroyed by fire."

83.     After the Sheriff removed Sharon, Shanni and her children became the sole occupants of 1140 Augusta Circle.

84.     Shortly thereafter, Tammy McCarl contacted Shanni and advised her that she disagreed with her action in obtaining the PFA Order. Tammy McCarl inferred that retaliation would be forthcoming including the loss of Shanni's children.

85.     Tammy McCarl verbally directed Shanni to leave the property on the basis that the lease listed only McCarl's name regardless of the fact that McCarl did not reside there but Shanni did.

86.     McCarl then contacted the owner of the 1140 Augusta Circle house, the defendants, and told them that she would not renew the lease since Plaintiffs caused Sharon to be evicted.

87.     McCarl advised the landlord that if Shanni was removed, she would reinstall Sharon at the house and purchase the property as nominee for Sharon.

88.  The defendants became livid. They did not want Shanni, a single
mother, living in the house with her children.

89.  Immediately thereafter, both the owner of the 1140 Augusta Circle
house and McCarl began a pattern of harassment and threats directing
Plaintiffs to leave the house.

90.  On June 28, 2011, with permission from the defendants, Tammy and
Kevin McCarl let themselves into the house at 3:00 p.m. and stayed at
the house until 1:00 a.m.  During this time, Tammy and Kevin McCarl
harassed and badgered Shanni Snyder and threatened retaliation,
including having her kids "taken away."

91.  On June 29, 2011, notwithstanding the PFA Order that directs Sharon
to hire a Constable who would make arrangements with Shanni for
Sharon to obtain her property, Kevin McCarl began beating on the door
to 1140 Augusta Circle.  Kevin McCarl did not announce his purpose for
being there and appeared to simply want in.  The defendants were
aware of this.

92.  With permission from the defendants, Kevin McCarl tried to open the
door, tried to enter with a key, and when that did not work, he banged
against the door, attempting to forcibly push it open.

93.  Fearing what Kevin McCarl would do if he broke in, and considering the
apparent rage he had, Plaintiffs took action to secure the doors from the
break in.

94.   In testimony, Kevin McCarl admitted that he came unannounced on the

day he was banging and attempting to enter the house.  Specifically,

under oath, Kevin McCarl testified:

    Q.   My question was, you showed up at this residence at 1140
         Augusta Circle knowing that Shanni was living there and her two
         children without giving any notice, is that correct?

    A.   Yes.

95.   Kevin McCarl further testified that he tried to enter without knocking

first.  Specifically, he stated:

    Q.   Did you knock at the door or did you just open the door?

    A.   No, I didn't have to.

  Q. That's not what I asked you. Did you knock at the door; you did not?

  A. No, didn't have to.

  Q. Okay.  And you then what, inserted a key in the door and attempted to
      open it?

  A. Yes, that's what I testified to earlier.

96.   After Kevin McCarl failed to break into the house, he called the North

Huntingdon Police and the defendants.

97.   Novak and Rizzo arrived on the scene.  Subsequently, Dreistadt went to

the location.

98.   Rizzo contacted William Scalise.  Scalise and his son came to the

location on behalf of the defendants.

99.   Novak and Rizzo told Shanni that they wanted to speak to her.

100.   Shanni spoke with  Novak and Rizzo through a window.

101.   Shanni repeatedly informed  Novak and Rizzo that she resided at the
address and that she was entitled to a *Notice to Quit* under the
Pennsylvania *Landlord Tenant Act of 1951*.

102.   Scalise demanded the police allow him to enter the house.  Novak and
Rizzo directed and instructed Shanni to allow Scalise to enter the house.

103.    Novak and Rizzo told Shanni that she was legally required to allow
Scalise to enter the house.

104.   When Scalise arrived, Novak, Rizzo, and Dreistadt directed Shanni to
allow him to enter the house.  Although Shanni did not grant
permission, when she opened the door, police officers entered along with
the landlord.

105.   Scalise walked around the house without Plaintiff's permission.

106.   Shanni repeatedly advised the police that she occupied the house, lived
at the house, and maintained rights under the Landlord Tenant Act.

107.   Shanni objected to Novak, Dreistadt, and Rizzo's forcing her to allow
Scalise into the house.

108.   After Scalise was done searching the house, he informed Novak and
Rizzo that he wanted George Snyder Jr. arrested for damaging the
doors.

109.   Rizzo subsequently contacted  Powanda on behalf of Scalise.  According
to Novak's police report, Powanda stated that, "Tammy can tell Shanni
to leave right now and if she didn't then it would be defiant trespass.
OR we can wait until the lease is up tomorrow at midnight and then at
1201 Mr. Scalise can tell her to leave or it would be Defiant Tresspass

[sic]."  Rizzo wrote that he discussed the matter with  Powanda.  Rizzo asserted in his police report that Powanda stated that Plaintiffs had "no rights under Landlord Tenant because she is not on the lease and the person who is on the lease is moving out of the house and the lease is up within 24 hours.  [Powanda] stated that if the current person on the lease tells her to leave it is a Defiant Trespass and at Noon on June 30th when the owner of the home Mr. Scalise takes the property back from Tammi Snyder he can order her out of the house and it becomes a Defiant Tresspass [sic]."

110.   At around noon, Dreistadt, Rizzo, and Novak, on behalf of defendants, told Shanni that she need to leave and if she did not leave by 12:01 a.m., she would be arrested for defiant trespass.

111.   Shanni again advised that she resided at the house and neither the defendants nor the Sublessor, Tammy McCarl, who did not reside at the house, provided a *Notice to Quit.*

112.   Shanni repeatedly advised  Dreistadt, Rizzo, and Novak that she resided at the house for nearly a year.

113.   In his police report,  Rizzo wrote, "While speaking with Tammy Snyder [McCarl] and her brother, we received conflicting information about how long [Plaintiffs were] living in the house.  The time table was between 4 months and 1 year."

114.    Dreistadt, Rizzo, and Novak told Shanni that she must allow Kevin McCarl to enter the house with the Constable and remove their property.

115.   Dreistadt, Rizzo, and Novak were shown the Court Order stating that the Constable must make prior arrangements with Shanni prior to picking up Sharon's belongings.

116.   Dreistadt, Rizzo, and Novak told Shanni that she must allow everyone to come inside and take the property belonging to Sharon.

117.   Plaintiffs advised Dreistadt, Rizzo, and Novak that Shanni disputed ownership of some of the items because some of it belonged to her. (Rizzo wrote in his report, "Shanni was telling us that she lived in the house and she is disputing property but admitted to us that most of the belongings were her sisters not hers").

118.   Dreistadt, Rizzo, and Novak again told the Plaintiffs that they had to allow Kevin McCarl and the persons with him into the house, but that they would tell them to come back in one hour so that Shanni could get dressed.

119.   Dreistadt, Rizzo, and Novak again reiterated that Shanni needed to leave the house by midnight.

120.   Plaintiffs again asserted that they maintained a right to be at the residence and that Tammy McCarl did not occupy the house and never lived at the house.

121.   At that time,  Novak went to Tammy McCarl and brought her back to the house.   Novak had Tammy open the door to the house.

122.   At that time,  Dreistadt, Rizzo, and Novak entered the house along with Tammy McCarl.

123.    Dreistadt, Rizzo, and Novak had Tammy McCarl tell Plaintiffs to leave the house by midnight.

124.    Plaintiffs attempted to turn on their video recorder to document the incident.

125.    As admitted by Novak in his police report, "Sgt. Rizzo, myself and Det Dreistadt stated that we did not want audio recorded.  We then left the residence and cleared the scene."

126.    Rizzo, Novak, and Dreistadt threatened Plaintiffs with arrest if they attempted to record them.

127.    Thereafter,  Rizzo, Novak, and Dreistadt had a conversation with Tammy McCarl and Scalise.

128.    According to Rizzo's police report,  Rizzo, Novak, Dreistadt agreed that Tammy McCarl would tell Plaintiffs that they needed to be out of the house by noon on June 30th and Tammy even agreed to have her movers take all of Shanni's belongings to the garage where she could easily remove them from the house."

129.    Rizzo, Novak, and Dreistadt then entered Plaintiffs residence without permission and again told Plaintiffs they had to leave and that Tammy McCarl's movers would place their belongings in the garage.

130.    Rizzo explains this in his report by stating, "We went back to the house and went inside and explained this to Shanni who refused to believe that she did not have rights under landlord tenant law."

131.    The police then left.

132.    About forty minutes after the police told Kevin McCarl to come back in one hour, he returned and demanded to enter.

133.    Plaintiffs, having consulted with legal advisors, learned that she did not need to let Kevin McCarl in as the Court Order stated that Sharon Snyder may return with a Constable and that the Constable needed to make prior arrangements with Plaintiffs.

134.    Additionally, it became evidence that Kevin McCarl intended to take items that did not belong to Sharon Snyder.

135.    As a result, Plaintiffs refused to open the door.

136.    Kevin McCarl started banging on the door and when he was unsuccessful he had Mark Snyder attempt to enter.

137.    Mark Snyder began kicking on the door and damaged the door.

138.    Thereafter, Mark Snyder entered kicking in another door.

139.    At that time, Kevin McCarl and his Constable entered and began boxing everything in the house, including items belonging to Plaintiffs such as certain furniture and televisions.

140.    Dreistadt, Rizzo, and Novak arrived on the scene again and witnessed Kevin McCarl and the Constable removing items, including Plaintiffs' property.

141.    Dreistadt, Rizzo, and Novak then left.

142.    With the permission of the defendants, Kevin McCarl, Mark Snyder, the Constable, and the Constable's crew forcibly entered the locked rooms of the house and, in doing so, damaged the doors.

143.   According to a police report by Rizzo, after the incident, he went to Scalise's real estate office and obtained a copy of the lease.

144.    Rizzo gave the lease to Novak.

145.    Novak took the lease to Powanda's house.

146.   On June 30, 2011, Rizzo contacted Powanda a second time.

147.    Rizzo explained to Powanda about the fact that the Plaintiffs had obtained *Protection from Abuse* Orders and that Sharon Snyder was removed from the property before the June 29, 2011, incident.

148.   Additionally, Rizzo advised Powanda that Plaintiffs' attorney would be contacting him.

149.   According to Rizzo, "ADA Powanda stated that gives [Plaintiffs] no standing at the residence that anyone can list any address on a PFA form. The lease is up and she still has no legal standing in the residence. [Powanda] stated that it will be a Defiant Trespass if [Plaintiffs] [choose to] stay at the residence after she is told by Mr. Scalise to leave the house. [Powanda] stated that [Scalise] should tell her to leave while the police are present at the residence. I told him that we ran her drivers information and she has a North Versailles, PA residence listed as her address."

150.   During the conversation between Rizzo and Powanda, Scalise called Novak and advised him that the lease was up on July 1, not June 30. Scalise advised that Plaintiffs' attorney called and left him a message but that he did not plan to return the call.

151.   Powanda, after being advised that the lease expired on July 1, 2011, told Rizzo that, "If or when Mr. Scalise goes to the house on Friday the same holds true that [Plaintiffs are] not permitted to be there and it is not a Landlord Tenant case."

152.   Notwithstanding that the Court Order stating that the Constable and Sharon Snyder could return one time to obtain the property, Scalise told Novak that Tammy McCarl would return to the residence in the morning of July 1, 2011, and remove more items belonging to Sharon.

153.   Novak voiced no objection to the disobeyance of the Court Order.

154.   On July 1, 2011, Plaintiffs filed a lawsuit against Scalise, the landlord. The suit sought injunctive relief under the Landlord Tenant Act to prohibit the eviction without judicial decree. The Prothonotary of Westmoreland County assigned case 4270 of 2011 to the suit.

155.   The police and the defendants knew Snyder went to the Courthouse to file papers asking for a resolution to the case.

156.   In the afternoon of July 1, 2011, Scalise informed the police that, since Plaintiffs were at the courthouse, he would give them until 4:00 p.m.

157.   At 4:05 p.m. on July 1, 2011, Jeffrey Bouldin and Sombo arrived at the residence and met with William Scalise.

158.   Jeffrey Bouldin and Sombo stated in a police report that upon arrival, "[Plaintiffs were] in process of moving and boxes were stacked."

159.   Jeffrey Bouldin and Sombo asked Plaintiffs when they would be done, and, according to Jeffrey Bouldin, Shanni stated by midnight.

160.   Jeffrey Bouldin advised Plaintiffs that they needed "to be gone" from the residence by 9:00 p.m. and that the police "would be back with Mr. Scalise to make sure [Plaintiffs were] gone."

161.   Jeffrey Bouldin then passed this information on to Arendas for disclosure to the next police shift.

162.   At 6:00 p.m. on July 1, 2011, Steinkopf was told by Bertok about the incident.

163.   According to Steinkopf, Bertok learned about the incident from Arendas.

164.   Dougherty told Arendas that if the Plaintiffs do not leave their residence, they are to be arrested for defiant trespass.

165.   Arendas told Bertok that Powanda approved this action.

166.   Arendas informed Bertok that Powanda instructed that the case was not a landlord tenant case.

167.   At 9:00 p.m. on July 1, 2011, Steinkopf, Bertok, and William Bouldin went to the residence and spoke with the landlord, William Scalise.

168.   Scalise told Steinkopf that he did not have a lease with the Plaintiffs, but that he did have a lease with Tammy McCarl and that Sharon Snyder was his tenant.

169.   According to a report by Steinkopf, Scalise stated to Steinkopf, Bertok, and William Bouldin that he had "told [Plaintiffs] to vacate the residence numerous times and has given [them] 5 days to move [their] belongings out but she refuses to leave. [Scalise] stated that he advised her to move out of the residence that she was no longer permitted in the

residence in front of [] Rizzo and Novak on June 29, 2011, at 1112 hours."

170. According to a report by Steinkopf, Steinkopf and Bertok "walked over to the front door and was met by Shanni Snyder and her 11 year old son who was holding a video camera. Sgt. Bertok told the 11 year old son to stop recording that we did not want our voices recorded that it was a violation of the wire tap law. The 11 year old son then stopped recording." Bertok described this incident similarly. Bertok wrote, "I could see the young boy with a video camera in his hand pointing at our direction. The red record light was on and I asked him if he was recording us. He said yes and I immediately told him to turn the camera off, that he was violating the Wire Tap Act. He turned the camera off...."

171. According to Steinkopf, "Shanni was asked again by Bertok to leave the residence that she would be able to make arrangements with William Scalise to come back at a later date to pack up her belongings."

172. Bertok wrote that he explained the Plaintiffs that he "was only going to tell [Shanni] this one time, that either she leaves this house immediately on her own or if she refuses, the she will be leaving with us. Shanni stated that she was not leaving. I pointed towards the front door and told her lets go, you are leaving now."

173. Steinkopf further wrote in his report that, "Shanni stated that she had rights under the Landlord Tenn Act laws and needed to be evicted.

Shanni pointed to [the lawsuit against Scalise] that was taped to the front door that displayed written in black marker CIVIL."

174.   Steinkopf narrated that, "Sgt. Bertok asked her again if she was going to leave the residence and she stated no."

175.   During the incident, Kauffman stood at the door preventing Plaintiffs from leaving.

176.   Bertok then instructed Shanni to go with them.

177.   Shanni was placed in the back of a police car and driven to the police station by William Bouldin.

178.   At the police station, Steinkopf photographed and fingerprinted Shanni.

179.   Bertok told Scalise to change the locks on the house and to come to the police station when he finished.

180.   Steinkopf directed Plaintiffs not to return to their residence and that they could make arrangements with Scalise to pick up their property.

181.   Steinkopf contacted Powanda at his home.

182.   Powanda told Steinkopf not to release Shanni unless she "provides an address other than Augusta Circle."

183.   On November 9, 2011, Tammy McCarl (nee Snyder) purchased the 1140 Augusta Circle property the landlord, William Scalise, and returned Sharon to the residence.

### A.   Pennsylvania's *Landlord Tenant Act of 1951*

184.   Pennsylvania enacted a statutory scheme known as the Landlord Tenant Law of 1951 to govern disputed between property owners and residents.

185.    Pursuant to Section 250.501 of the *Landlord Tenant Law of 1951*, a landlord is required to serve a *Notice to Quit* upon the resident.  In the case of an expired lease, as is the basis the  used here, the landlord must provide fifteen (15) days before he can begin to evict.  He cannot simply call the police and have the person removed.

186.    Thereafter, pursuant to Section 250.502, the landlord may file suit before a District Justice who would hold a hearing between one week and ten days after the filing.'

187.    Under Section 250.503, after the hearing, if the District Justice rules in favor of the landlord, the landlord may apply for a *Writ of Possession* five days after the judgment.

188.    The Writ of Possession must be served within forty-eight (48) hours and can be executed on the eleventh day (11) thereafter.

189.    Section 250.513 provides a thirty (30) day period to appeal for victims of domestic violence, such as the Plaintiffs, and ten (10) days otherwise.

190.     The terms of a lease apply whenever a tenant occupies a residence through a sublease.

191.    Section 250.105 makes it clear that any sublessee shall be governed by the lease as well.

192.    MerriamWebster.com defines a tenant as, *inter alia*, "One who has the occupation or temporary possession of lands or tenements of another." It refers to the term "occupant" as a synonym.  Neither the landlord, William Scalise, nor the sublessor, Tammy McCarl, complied with any of the procedures required by Pennsylvania law to evict the Plaintiffs.

193.   As explained above, each of the s directed "self help" eviction.

194.   The "self help" eviction occurred without reference to the procedures outlined by Pennsylvania's *Landlord Tenant Act of 1951*.

195.   The lease did not prohibit Snyder's residency and clearly stated that two adults and two children would live at the residence.

196.   Tammy McCarl did not and never did reside at the residence.  Scalise knew Tammy McCarl acted as a nominee and sublet the residence to Sharon Snyder and, in any event, for the occupancy by two adults and two children.

197.   The  defendants collectively knew that Plaintiffs obtained a *Protection from Abuse Order* ejecting Sharon Snyder from the residence.

198.   At the time of the ejectment of Sharon Snyder, the defendants knew, or should have known from the clear language of the PFA Order, that the sole remaining residents were the Plaintiffs and Shanni's other son.

199.   Although the *Landlord Tenant Act* provides a remedy for the landlord when a lease expires, the defendants instead assisted the police with a "self help" eviction.

200.   The actions of the defendants aided and abetted police and their intrusion into the private life of the Plaintiffs and the obstruction of their right to quiet enjoyment of the premises.

201.   The actions of the defendants infringed upon the Plaintiffs property rights and their privacy rights, both of which are protected by the Fourth and Fourteenth Amendments to the United States Constitution.

202.   In doing so, the defendants acted under color of law and joined with the police.

203.   The defendants did not only stand by and allow police trample on the residency and occupancy rights of the Plaintiffs, they actively participated and even formulated a plan to allow the lease to expire so that they could, albeit unlawfully, tell Plaintiffs to leave.

204.   Long prior to this case, the Supreme Court clarified that police assisting a landlord in an extrajudicial eviction violates the Fourth Amendment. *See Soldal v. Cook County*, 506 US 56, 58 (1992). Pennsylvania federal courts have explained that law enforcement officers who actively assist a private party to evict an occupant "without an order, a writ, a warrant, or any statutory authority [engage in] precisely the type of unreasonable behavior that the Fourth Amendment forbids." *Open Inns, Ltd. v. Chester County Sheriff's Office*, 24 F.Supp. 2d 410, 424 (E.D.Pa. 3rd 1998)(citing *Soldal*).[3]

205.   The Defendants, through their threat to arrest Shanni Snyder on serious charges, effectively assisted the landlord in evicting the Plaintiffs and ultimately did evict them.

206.   The Defendants' actions constituted an invasion of privacy and a seizure of property rights.

---

1.    [3] In *Radvansky v. Olmsted Falls*, 395 F3d 291 (6th  Cir. 2005), interpreting *Soldal*, the police arrested a tenant for burglary for returning after the landlord changed the locks to his apartment and he broke in. The arrestee sued the police for false arrest, but the district court gave the police qualified immunity.  The Sixth Circuit reversed. The Court noted that the arrestee was using the property to house his personal possessions, clothing, and furniture, making him a current tenant with the right to enter and occupy the premises, "who could not, therefore, be found liable for either criminal trespass or burglary."

207.   As such, the Defendants, under color of law, violated Plaintiffs' rights under the Fourth Amendment and Fourteenth Amendment to the United States Constitution.

208.   Plaintiffs were damaged as a proximate result of the actions of the defendants in that Plaintiffs were evicted from their home, had to find temporary shelter, lost use of their personal property, received an inordinate amount of emotional distress, and incurred myriad expenses.

WHEREFORE, Plaintiff respectfully demands that this Court:  (1) Award actual damages to be proven at trial, (2) Award treble damages, (3) Award compensatory damages, (4) Award punitive damages, (5) Enjoin each of the defendants from engaging in further acts similar to those described herein, (6) award costs, and (7) grant any and all further relief as may be appropriate and just.


**COUNT V – 42 USC 1983 (VIOLATIONS OF THE FIFTH AMENDMENT'S DUE PROCESS CLAUSE  OF THE UNITED STATES CONSTITUTION AS MADE APPLICABLE TOSTATES PURSUANT TO THE FOURTEENTH AMENDMENT)**

209.   Paragraphs 1 through 208 are hereby incorporated by reference and realleged as if fully set forth again.

210.   The defendants acted jointly with the police under color of state law.

211.   Not only did the action of the defendants in formulating a plan to remove Plaintiffs from their residence violate the Fourth Amendment's right to be free from an invasion of privacy and the seizure of property, it also deprived the Plaintiffs of their right to due process.

212.  The *Landlord Tenant Act of 1951* constitutes a scheme to provide occupants of residential housing with due process prior to being removed from their house.

213.  In this case, it is patently clear that the defendants knew that the Plaintiffs occupied the house.

214.  The defendants knew that Plaintiffs' personal belongings were within the house.

215.  The defendants clearly discussed the personal property possession with the landlord and the Plaintiffs, so they cannot claim that they did not know that the Plaintiffs were residing in the house.

216.  The police officers' own reports indicate that the Plaintiffs lived in the house for between four months and one year.  The defendants knew this as well.

217.  The defendants clearly concocted a plan to allow the lease to expire prior to evicting the Plaintiffs.

218.  However, the defendants ignored language within the *Landlord Tenant Act* that provides a landlord must provide fifteen (15) days notice prior to prior to beginning the eviction process.

219.  There was no indication of circumstances that carry the potential of immediate, serious bodily harm, which may serve to justify eviction without pre-deprivation process.

220.  The defendants knew they did not have a Writ of Possession and that the eviction was illegal.

221.   Second, it is "elementary that procedural due process is implicated only where someone has claimed that there has been a taking or deprivation of a legally protected liberty or property interest." *Board of Regents v. Roth*, 408 U.S. 564, 569 (1972)

222.   It is also well established that possessory interests in property invoke procedural due process protections. See *Fuentes v. Shevin*, 407 U.S. 67, 87, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972).

223.   By actively assisting the landlord and sublessor to perform a "self help" eviction, and by constantly harassing and threatening the Plaintiffs, the defendants violated the Plaintiffs' due process rights to be free from a "self help" eviction and to have quiet enjoyment of the premises as required by the *Landlord Tenant Act.*

224.   As such, under color of law, the defendants collectively and individually violated Plaintiffs rights to due process under the Fifth and Fourteenth Amendments to the United States Constitution depriving them of life, liberty, and property.

225.   Plaintiffs were damaged as a proximate result of the actions of the defendants in that Plaintiffs were evicted from their home, had to find temporary shelter, lost use of their personal property, received an inordinate amount of emotional distress, and incurred myriad expenses.

WHEREFORE, Plaintiff respectfully demands that this Court:  (1) Award actual damages to be proven at trial, (2) Award treble damages, (3) Award compensatory damages, (4) Award punitive damages, (5) Enjoin each of the defendants from engaging in further acts similar to those described herein, (6) award costs, and (7)

grant any and all further relief as may be appropriate and just.

### COUNT VI – 42 USC 1983 (VIOLATIONS OF THE FOURTH AMENDMENT TO THE UNITED STATES CONSTITUTION AS MADE APPLICABLE TO STATES PURSUANT TO THE FOURTEENTH AMENDMENT)

226.   Paragraphs 1 through 225 are hereby incorporated by reference and realleged as if fully set forth again.

227.   The defendants acted jointly with the police under color of state law.

228.   Well established case law from the United States Court of Appeals for the Third Circuit placed the defendants on notice that they are not to involve themselves in disputes over property. In *Abbott v. Latshaw*, 164 F3d 141, 149 (3rd Cir. 1998), cert. denied 527 US 1035 (1999), the Third Circuit made it clear that it is not for law enforcement officers to decide who is entitled to possession of property." Rather, "it is the domain of the courts." *Id.*

229.   Novak, Rizzo, and Dreistadt, on behalf of the defendants, directed Plaintiffs to allow Kevin McCarl to come into Plaintiffs residence and obtain property.

230.   Novak, Rizzo, and Dreistadt ignored the fact that the Court Order allowing authorization required the Constable to make arrangements with Plaintiffs prior to entering.

231.   Novak, Rizzo, and Dreistadt ignored Plaintiffs dispute that some of the items did not belong to Kevin McCarl or Sharon Snyder.

232.   Novak, Rizzo, and Dreistadt's directive to Plaintiffs to allow Kevin McCarl entry to take whatever property constituted an active

participation in a repossession which deprived Plaintiffs of certain furniture items and televisions.

233.    Novak, Rizzo, and Dreistadt's actions, jointly with the defendants, under color of law, violated Plaintiffs' rights under the Fourth Amendment to the United States Constitution as made applicable to the states under the Fourteenth Amendment to the United States Constitution.

234.    Plaintiffs were damaged as a proximate result in that property belonging to them including furniture and electronic devices were seized by Kevin McCarl and his group with the permission of the defendants, and the joint actions between the defendants and the police acting under color of state law.

WHEREFORE, Plaintiff respectfully demands that this Court: (1) Award actual damages to be proven at trial, (2) Award treble damages, (3) Award compensatory damages, (4) Award punitive damages, (5) Enjoin each of the defendants from engaging in further acts similar to those described herein, (6) award costs, and (7) grant any and all further relief as may be appropriate and just.

**COUNT VII – 42 USC 1983 (VIOLATIONS OF THE FOURTH AMENDMENT TO THE UNITED STATES CONSTITUTION AS MADE APPLICABLE TO STATES PURSUANT TO THE FOURTEENTH AMENDMENT)**

235.    Paragraphs 1 through 234 are hereby incorporated by reference and are realleged as if fully set forth again.

236.    The defendants acted jointly with the police under color of state law.

237.   Novak, Rizzo, and Dreistadt, and the defendants, by forcing the Plaintiffs to allow William Scalise to enter their residence without a judicial order violated Plaintiff's right to be free from search and seizure and free from unwarranted invasion of privacy in violation of the Fourth Amendment to the United States Constitution.

238.   Novak, Rizzo, and Dreistadt acted under color of law in forcing Plaintiffs to allow Scalise to enter, and they acted jointly with the defendants.

239.   The actions of Novak, Rizzo, and Dreistadt, working jointly with the defendants, in violating Plaintiffs rights under the Fourth Amendment to the United States Constitution caused the Plaintiffs damage as a proximate result.

WHEREFORE, Plaintiff respectfully demands that this Court:  (1) Award actual damages to be proven at trial, (2) Award treble damages, (3) Award compensatory damages, (4) Award punitive damages, (5) Enjoin each of the defendants from engaging in further acts similar to those described herein, (6) award costs, and (7) grant any and all further relief as may be appropriate and just.

**COUNT VIII – 42 USC 1983 (VIOLATIONS OF THE FOURTH AMENDMENT TO THE UNITED STATES CONSTITUTION AS MADE APPLICABLE TO STATES PURSUANT TO THE FOURTEENTH AMENDMENT)**

240.   Paragraphs 1 through 239 are hereby incorporated by reference and realleged as if fully set forth again.

241.   The defendants acted jointly with the police under color of state law.

242.   Novak, Rizzo, and Dreistadt, working jointly with the defendants, by entering the residence of Plaintiffs on June 29, 2011, without

permission, violated the Plaintiffs' right to be free from unlawful search and seizure and violated the Plaintiffs privacy rights in contravention of the Fourth Amendment to the United States Constitution.

243.   Novak, Rizzo, and Dreistadt acted under color of law and acted jointly with the defendants.

244.   As a proximate result of the Fourth Amendment violations by Novak, Rizzo, and Dreistadt, working jointly with the defendants and at their direction, the Plaintiff w damaged.

WHEREFORE, Plaintiff respectfully demands that this Court:  (1) Award actual damages to be proven at trial, (2) Award treble damages, (3) Award compensatory damages, (4) Award punitive damages, (5) Enjoin each of the defendants from engaging in further acts similar to those described herein, (6) award costs, and (7) grant any and all further relief as may be appropriate and just.

### COUNT IX – 42 USC 1983 (VIOLATIONS OF THE FOURTH AMENDMENT TO THE UNITED STATES CONSTITUTION AS MADE APPLICABLE TO STATES PURSUANT TO THE FOURTEENTH AMENDMENT)

245.   Paragraphs 1 through 244 are hereby incorporated by reference and are realleged as if fully set forth again.

246.   The defendants acted jointly under color of state law with the police.

247.   By directing the removal of the Plaintiffs from their residence, and advising that Plaintiffs must make arrangements with William Scalise to pick up their personal property at some other time,  William Bouldin, Kaufmann, Steinkopf, and Bertok allowed William Scalise and the defendants to take the Plaintiffs property.

248.   As a result, Scalise took many items belonging to the Plaintiffs and eventually converted them to his own use or gave them to Kevin and Tammy McCarl.

249.   William Bouldin, Steinkopf, Kauffman, and Bertok acted under color of law, and jointly with the defendants, in removing the Plaintiffs from their residence and allowing Scalise to take possession of Plaintiffs' property.

250.   The actions of William Bouldin, Steinkopf, Kauffman, Bertok, and the defendants, in allowing Scalise to take possession of the property constituted a seizure and invasion of privacy under color of state law.

251.   As a proximate result of the Fourth Amendment violations by William Bouldin, Kauffman, Steinkopf, Bertok, and the defendants, Plaintiffs were damaged in that the following items were retained by Scalise and/or given by Scalise to Kevin McCarl:  $3,800.00 cash, Jewelry box 1k with 8-10k in jewelry in it,  In bathroom sapphire necklace with earrings -$1500, 5 Silver rings- $200.00, 2 Cherry Dressers my room– 2k, 2 wine glasses -$30, Clothes rack- $100, 3 Mattresses box springs and mattress pads -$1500, 3 bed frames- $60, 1 iron head board- 1k, 100 cd movies 1k and in boxes, with the stand -$50, ten pictures in frames - $100, 1 white phone/fax machine- $40, Lalique glass vase- $300, extra blankets $100, electric blanket -$30, 2 Seiko watches- $60, 2 alarm clocks- $40, 2 gold dipped roses- $100, Bathroom, Set of Beige towels $100.00, 5 bottles of Framesi shampoo- $100, 4 one gallon bottles of conditioner- $80, Professional hair dryer- $60, flat iron- $100,

purses and bags $100, shower curtains $80, Shower curtain hooks-
$50, 5 area rugs- $80,2 – shower rods- $20, cleaning supplies- $100, 2
Adult male robes- $100, 1 Victoria secret robe- $50,3 – large wicker
laundry baskets -$200, 1shoe box of hardware- $75, 2 mountain bikes,
3 large pieces of luggage- $180, professional hockey stick -$100, 2 –
baseballs from the 2006 Pirates all star game- $50,1- professional drum
set, 2 pairs of Heely's -$60, paper guitar - $25, guitar- $100,1 – pair of
Salomon skis- $180, 2 pair of- Rossignol ski boots- $200, 1 pair of
child's mongoose roller blades- $50, 4 - fishing poles $120, 3 –
basketballs -$50, 4 Harlem Globe Trotters basketballs $150, 1 pair
adult roller blades- $85, 2 ski poles- $40, 2 aluminum bats -$50, 2
pairs of boxing gloves- $50, 1 pair padded punch blockers- $20, 2 foam
targets for blow darts, 2- Kitty litter boxes- $20,10 pieces of Large
storage containers, Kitchen dishes 8 piece $100, Casserole dishes pie
pans misc. $100, pots and pans - $150, Antique decanter with glasses -
$80, Silverware- $40, crock pot- $30, Utensils-$100, food- $600, 1
computer chair- $150, 3 shelf steel and wood shelves - $75, 1 Olympus
digital camera - $150, 1 JVC camcorder - $350, 2 Guess leather coats-
$300, 1 – spider gear winter coat- $100, 2- North face winter coats-
$300, 10- baseball hats- $180, 3 pair of winter boots- $150, 3 face
masks- $50, 10 winter hats- $100, 5- pair of gloves- $100,2 - scarves
$40,  4- back packs- $200, Harry Potter Nimbus 2000- $250,  Harry
Potter wall hangings- $60, 6 Harry Potter movies- $100, Dragon Ball Z-
whole series- $400, bop it -$10, granite book ends- $30, 3 – bibles -

$60, 100 books – 1k, water colors - $50, awards and trophies, boys knickknacks they homemade, 3 photo albums - $40, x-box 360, psp – 3 games, dsi- 15 games, Game Boy- 7 games, 2 game cubes,20 stuffed animals - $200,1 – alligator head - $20, 50 – Nerf guns- plus ammo 1k, 1000- Yugio- Pokemon cards 1k-2k, 1 limited signature series pantera claws - $50, puzzles- $50,3- Zippo lighters- $60, 5 – air soft guns- $120, 2 sleds- $50, Foam flooring for weight equipment- $80, 4- 25lb weights, 4 10 lb weights, black and white curtains and sheers- $100, 5 Tupperware containers -$100, 5 boxes of clothes –,file folders and stamps - $20, buffet table - $50,2 Easter baskets -$30,2 bowling balls- $120,spy glasses- $15, safe- $20,Professional puppet set - $100,professional magic set- $100,Halloween decorations- $100,Christmas tree- $100,ornaments- $300,wreath - $30,Lighted garland -$100,Mr. and Mrs. Clause on a couch -$80, among other things.

252.    In addition to the items not returned as a result of the actions of William Bouldin, Kauffman, Steinkopf, Bertok, and the defendants, numerous other items were ultimately returned by Kevin McCarl and McCarl's Services, but damaged. Presently, Plaintiffs have not fully assessed the damage and a list will be provided to the Defendants as it becomes available.

WHEREFORE, Plaintiff respectfully demands that this Court: (1) Award actual damages to be proven at trial, (2) Award treble damages, (3) Award compensatory damages, (4) Award punitive damages, (5) Enjoin each of the defendants from

engaging in further acts similar to those described herein, (6) award costs, and (7) grant any and all further relief as may be appropriate and just.

**COUNT X—42 USC 1983 (VIOLATIONS OF THE FIRST AND FOURTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AS MADE APPLICABLE TO STATES PURSUANT TO THE FOURTEENTH AMENDMENT)**

253.    Paragraphs 1 through 252 are hereby incorporated by reference as if fully set forth again.

254.    The defendants acted jointly with the police under color of state law.

255.    On June 29, 2011,  Novak, Rizzo, Dreistadt, and the defendants prevented the Plaintiffs from videotaping in their own residence.

256.    Novak, Rizzo, Dreistadt, and the defendants, or jointly with the defendants, instructed, under threat of arrest, the Plaintiffs to stop recording.

257.    On July 1, 2011, William Bouldin, Steinkopf, Bertok, jointly with the defendants, directed Plaintiffs to stop videotaping in their own residence.

258.     Bertok cited a so-called *Wire Tap Act* as the criminal offense that prohibits the videotaping.

259.    However, Pennsylvania enacted no law that prohibits a person from videotaping or recording sounds or conversations, especially in one's own residence.

260.    Apparently,  William Bouldin, Steinkopf, and Bertok were referring to Pennsylvania's *Wiretapping and Electronic Surveillance Control Act,* 18 Pa. C.S. 5701, *et seq.*

261.   Plaintiffs have clearly established rights to videotape police officers and the defendants, working jointly with the police, in the performance of their public duties and/or, in this case, engaging in misconduct.

262.   This right is accelerated and enhanced when the occurrences took place in Plaintiffs' own home.

263.   By instructing Plaintiffs to stop videotaping the conduct of the police in the Plaintiffs own residence,  William Bouldin, Steinkopf, Bertok, Novak, Rizzo, Dreistadt, and the defendants, unlawfully interfered with Plaintiffs' constitutionally protected rights under the First Amendment to the United States Constitution.

264.   If 18 Pa.C.S. 5701, et seq., prohibits the voice and video recording of the police activity, in plain view and without an element of covert action, in the Plaintiffs' own home, the statute violates the First and Fourth Amendments to the United States Constitution as made applicable pursuant to the Fourteenth Amendment to the United States Constitution and must be declared unconstitutional.

265.   If 18 Pa.C.S. 5701, et seq., enables the police to direct a person, in their own home, to turn off their video and voice recorders, the statute violates the First and Fourth Amendments to the United States Constitution.

266.   Plaintiffs were damaged by the instruction of the police and the defendants, under threat of arrest, to stop filming.

267.    Defendants acted under color of law, in a joint activity with police officers acting under color of law, when they directed the Plaintiffs to stop filming on two occasions.

WHEREFORE, Plaintiff respectfully demands that this Court:  (1) Award actual damages to be proven at trial, (2) Award treble damages, (3) Award compensatory damages, (4) Award punitive damages, (5) Enjoin each of the defendants from engaging in further acts similar to those described herein, (6) award costs, and (7) grant any and all further relief as may be appropriate and just.

### COUNT XI – Pennsylvania Landlord Tenant Act of 1951

268.    Paragraphs 1 through 267 are hereby incorporated by reference and are realleged as if fully set forth again.

269.    As demonstrated above, the defendants violated provisions of the Pennsylvania Landlord Tenant Act of 1951 by evicting the Plaintiff without providing a notice to quit, obtaining a judgment, or following any of the due process procedures established in the statute.

270.    The defendants violated provisions of the Landlord Tenant Law of 1951 by not providing quiet enjoyment of the residence.

271.    The defendants violated provisions of the Landlord Tenant Law of 1951 by attempting to prohibit the Plaintiff from having visitors of her choice.

WHEREFORE, Plaintiff demands judgment against the defendants in an amount to be proven at trial along with compensatory, punitive, and special damages along with costs, attorney fees, and any other relief that may be appropriate and just.

### COUNT XII -- Conversion

272.   Paragraphs 1 through 271 are hereby incorporated by reference and are realleged as if fully set forth again.

273.   As explained above, various furniture, money, and personal property belonging to the Plaintiff was taken by William Scalise.

274.   The property was retained and taken by Scalise and RMSW with the knowledge of the other defendants.

275.   The defendants deprived Plaintiff of her right to property and use thereof and interfered with her use therewith by retaining and impounding it, or turning it over to Kevin McCarl without the Plaintiff's permission.

276.   The conversion of Plaintiff's property was without her permission or consent.

277.   The defendants did not have lawful justification to retain the property or to turn it over to Kevin McCarl.

278.   The defendants made no attempt to contact Plaintiff or to return the property.

279.   Rather, within a short period of time, they provided the property to Kevin McCarl or took the items for themselves.

WHEREFORE, Plaintiff demands judgment against the defendants in an amount to be proven at trial along with compensatory, punitive, and special damages along with costs, attorney fees, and any other relief that may be appropriate and just.

**COUNT XIII – Intentional Infliction of Emotional Distress**

280.    Paragraphs 1 through 279 are incorporated by reference and realleged as if fully set forth again.

281.    Defendants conduct in evicting the Plaintiff without notice and without a court order and causing her to be displaced, charging her with trespass, forcing her to defend it, and subsequently allowing third-parties to take her children into the property constitutes extreme and outrageous actions.

282.    The defendants intended to take the actions they did.

283.    The actions caused emotional distress.

284.    The emotional distress was severe and Plaintiff required medical attention and therapy as a proximate result.

WHEREFORE, Plaintiff demands judgment against the defendants in an amount to be proven at trial along with compensatory, punitive, and special damages along with costs, attorney fees, and any other relief that may be appropriate and just.

**COUNT XIV – Invasion of Privacy – Intrusion Upon Seclusion**

285.    Paragraphs 1 through 284 are hereby incorporated by reference and are realleged as if fully set forth again.

286.    Defendants intentionally intruded, physically and otherwise, upon the solitude and seclusion of Plaintiff.

287.    The intrusion, including entering her residence with police, then going through Plaintiff's personal effects after having her wrongfully evicted, would be highly offensive to a reasonable man.

288.   As a proximate result of the intrusion upon seclusion by the defendants, Plaintiff was damaged.

WHEREFORE, Plaintiff demands judgment against the defendants in an amount to be proven at trial along with compensatory, punitive, and special damages along with costs, attorney fees, and any other relief that may be appropriate and just.

## COUNT XV – Malicious Prosecution

289.   Paragraphs 1 through 288 are hereby incorporated by reference and realleged as if fully set forth again.

290.   Defendants instituted criminal proceedings for defiant trespass against the Plaintiff.

291.   The proceedings were instituted without probable cause.

292.   The defendants instituted the proceedings with malice.

293.   The proceedings terminated in Plaintiff's favor when a Magisterial District Judge in Westmoreland County found no probable cause for the case.

WHEREFORE, Plaintiff demands judgment against the defendants in an amount to be proven at trial along with compensatory, punitive, and special damages along with costs, attorney fees, and any other relief that may be appropriate and just.

I, Shanni Snyder, declare and state under the penalty for perjury that the foregoing is true and correct to the best of my knowledge, information, and belief (28 USC 1746).

Respectfully submitted,

Shanni Snyder
PO Box 96
East McKeesport, PA  15035
(412) 758-1371
s.snyder@box96.net


PLAINTIFF